Good morning, and may it please the court, my name is Charles Workin, I represent the appellants STI Trucking and Alex Kim. It is my hope to reserve five minutes for rebuttal and possibly addressing the issues in the cross appeal. The judgment in favor of the plaintiff should be reversed in this case for any or for all of the reasons discussed in the appellant's briefs. Three of those reasons are incontrovertible. One is the lack of expert testimony as to causation. The other is the resulting excessive damages. And the third is the failure to instruct the jury regarding comparative fault. Allow me to explain. The first two are really the same reason, aren't they? They are linked, yes. Well, I mean, to put it differently, if there was sufficient evidence as to causation, do you have a separate argument about why the damages were excessive? I do not, Your Honor. So two is dependent on one, correct? All right. So let's turn, please turn to that. To causation. First, to address the Court's focus order. Medical evidence of multiple, merely possible causes of an injury is insufficient. Without expert testimony, any other evidence of causation or other circumstances indicating causation is irrelevant. What do you do with the language in, I guess what I would call Coca-Cola II, and which appears not only in that case, but as I recounted in half a dozen Arizona cases, including an Arizona Supreme Court case, that says, if there's evidence of the possibility and other evidence that allows you to draw the conclusion of causality, that's enough? Well, and I was going to call it Fitzgerald. That's probably a better, probably a better name for it. To distinguish it from the other Coca-Cola case that we've cited. But how do you square the mention of mere possibility with the other cases that require expert testimony? Well, see, as I read Fitzgerald, it says we normally require expert testimony. Of course, there's one exception, which is that when it's so obvious, he had an arm before the accident, he lost it, it wasn't there afterwards, we don't need it. But there's a third category, Fitzgerald seems to say. If you've got medical evidence that it's possible, and the other evidence would allow a reasonable finder of fact to find causality, we won't disturb the jury verdict. And the Court says that not here, but so many times in different cases that it can't just be stray language. But in Fitzgerald, there was medical testimony. And in all the other cases that are cited in this case, there was medical testimony. There is not a case that finds causation on the mere basis of some comment in a medical record. Well, counsel, isn't it more than just a little comment? I mean, for one thing, the diagnosis is stated as a new diagnosis, and then immediately following the phrase, new diagnosis, is the explanation that there was a trauma, given the motor vehicle accident, and there's additional commentary. But it seems more than a sort of passing phrase. And I didn't quite hear the source you were referencing, Your Honor. I'm looking at Dr. Clauvel's. Okay, thank you. Yes. I'm sorry. I should have started there. Her notes.  Yes. Dr. Clauvel's record does not suffice. It mentions three alternative causes. One is a motor vehicle accident. One is something that is referred to by the initial CSR. And the other is idiopathic. Nobody knows. Counsel, can you refer us to what particular ER site you're looking at? It's 1290, I believe. I'm looking at page 1290 of the record, and that's part of Exhibit 27C. Dr. Clauvel does not conclude that the motor vehicle accident is the cause. In fact, Dr. Clauvel goes on at page 1384 to say that CSR is the most likely cause. And keep in mind that we're dealing here in a context of a gentleman who has a preexisting condition. He had blurry vision beforehand, and he had an acute loss of vision in the left eye before the accident. Let me understand your position, because it seems to me you might be arguing one of two things. One is that it's notwithstanding what Fitzgerald says, it's not enough if there's medical testimony that it's merely a possibility. The medical testimony must be to a reasonable degree of certainty. It caused it. Is that your position? Yes, Your Honor. So it really doesn't matter to your argument whether Dr. Clauvel's information comes from her medical records, which were admitted into evidence, or whether she said it on the stand. If she were on the stand and said exactly the same thing, your view is that that would be insufficient. Without anything more, that's right. Okay. Now, I'm still stuck with what am I to make of the language in these cases that say the possible, not even the probability, but the possibility is enough if other evidence would allow a rational finder of fact to draw the link. I suggest to you that that word possible or possibility is used loosely in those cases. And the issue in those cases was not the issue that's in this case. And again, in those other cases, there was testimony. So wasn't there only testimony about the possibility? In those cases, not to a reasonable degree of medical certainty. The cases don't give us enough detail to know what was said on the stand. And one would assume that when the doctor is testifying, there's a sufficient foundation laid, and he or she is being asked to testify to a reasonable degree of medical certainty. Otherwise, it's not admissible. So, and then you've got to square those cases that use the word possible or possibility with other cases that require expert testimony. And at bottom here, Your Honors, the jury cannot be left to speculate, which is where the position in which they were left in this case, because you've got, again, as I said, reasonable causes, and this background of a preexisting condition. And the jury was instructed that it cannot speculate. And I refer you to the supplemental excerpts of record at page 24 for that instruction. Yes? So in Montauk, we had, I think, facts that are similar to the facts here, which is, or, you know, maybe they're not factually similar in terms of the condition, but there the plaintiff had a history of dizziness and had medical records that indicated that that preceded the accident. And yet, in that case, the Court of Appeals also held that an expert testimony was not necessary for the jury to conclude causation. So I'm still, and maybe I'm asking you the same question that you've tried to answer from Judge Hurwitz, but I'm not understanding how we can distinguish those cases from what the facts that we have here, finding that there's at least some evidence that was presented to the jury with respect to the cause of this injury. And with that information, it's sufficient for the jury to reach the conclusion that was caused by this particular accident. May I ask you, which case were you just referring to? Montauk v. Deagle, or Montague v. Deagle. That's 462P, second, 403. Okay, well, again. Are you familiar with that case, counsel? I think my recall on that one is failing me. But there was medical testimony in that case? There was no expert testimony, and the Court of Appeals held that a jury did not need an expert to conclude that an accident caused the plaintiff's dizziness. And there was a condition that was the subject of the claim that preceded the accident at issue. That sounds like a situation where the exception applies, where the cause is apparent and expert testimony isn't needed. If I understand your summary of the case. Right, and I think my question is, how is that any different than the facts that we have before us in this case? Because we don't have a condition, the cause of which is readily apparent to a lay juror, to any juror. And this is a, it's obviously something of a mystery, what the causation was, because the doctor herself cannot pin any one of these. Well, in fact, she does attribute one of them as being the most likely cause, and that is the so-called CSR. Not the motor vehicle accident, and not something idiopathic. But you've got this menu of causes in front of the jury, one of which the doctor emphasizes. How is the jury to choose between them without speculating, which they're not allowed to do? Because it isn't apparent. This isn't like Coca-Cola One with the drinking of the contaminated Coke. It's not like the dental case. I'm not sure why that's true. If some, this individual had a concussion, basically smacked his head, and then had blurry vision right then. I'm not sure why that's not obvious. Well, here, it might be obvious if those were the only facts in this case, but they are not, because we don't. No, because he had blurry vision earlier, but that's just like the case that Judge Desai is talking about. I mean, if I had a broken arm four years ago, and I'm in an accident, and I break my arm, it sort of doesn't matter that I had the same condition four years earlier. I really don't understand why it's not obvious in this instance. Well, I submit to you that a broken arm is a bad example. It's just an example. It's a bad example, but I guess I still don't understand why it's not obvious. Well, we're talking about the cause of the blurry vision, which already existed, and if this... But it didn't exist at the immediate moment before the motor vehicle accident. It didn't exist in the same form, but right before the accident. Oh, I think it did exist in the same form. And we recite the history of his... Yeah, but you do recite it, but doesn't that suggest that in May, he had an eye test that was essentially normal, and that one month after the accident, he had an eye test that was grossly not normal? I mean, it does appear indisputable that the measurement of his vision got worse in the aftermath of the accident. Well, where is the doctor to make the causal link there? There isn't. And I don't think in these circumstances... So if I were to agree to you that it's not obvious, your position is that all this language in Coca-Cola and the half dozen other cases that say it's enough if there's medical evidence that it's a possible cause really doesn't apply? Well, again, Your Honor, I think possible is used too loosely in those cases because... So you think possible means there has to be medical testimony that it is a probable cause? Yes, as there was in those cases. And I think I might move on to the issue of the lack of comparative fault instructions. Can I ask you some procedural questions about that for a second before we get to whether or not the evidence warranted that instruction? At some point, there was submitted to the judge a set of proposed instructions that said no comparative fault instruction. And it appears that you didn't try the case. So when I say you, I mean your side. Yes, I understand. Well, sometimes people say it's not my fault and it's not your fault. But nobody objected. In fact, your side said, yes, that's right, that's what we've agreed to. And then later on, there were proposals for a comparative fault instruction. I'm just trying to figure out whether or not, given the way this case progressed, that issue is in front of us. Yes, it is. And it's, you know, Rule 51 allows the court to add instructions at any time before. But it doesn't require the court to. And so here's a circumstance where they're not submitted in accordance with the court's standing order.  And not only are they not submitted, but there's some indication agreed to by both parties that there isn't going to be a comparative fault instruction in this case. I mean, it says no comparative fault instruction. And your side says, yeah, that, you know, we sort of – I don't have to say we agree, but, yes, we, you know, we don't have any objection to what he's put in. And now, late in the case, you come in with a request for one. Why is that – why should the judge consider it? I know she did, but why should she? Because this is such a substantive right and because this issue of comparative fault is only for the jury to decide. And contrary to the court's order denying the motion for new trial, there was evidence of comparative fault. And if that evidence – Mr. Lucero could have braked or he could have moved aside to avoid the accident. But in the opening statement, plaintiff's defense counsel said, well, he can't really brake because he's got this big truck. And the video of the accident seems to show he's right next to the guardrail. So I'm trying to figure out how it was that he could have avoided the accident. The guardrail was on down the road, Your Honor. It was more than 200 feet away from the point of impact. And this vehicle, Kim's vehicle, is alongside. And one of the facts that we're relying on is that Mr. Lucero was inattentive. And he acknowledges that he was not looking to the left. He was looking at the green truck down the road. And he's looking at his right mirror, not his left. Well, the reason he's not looking to the left is that he doesn't anticipate that Mr. Kim is going to cross over into his lane and hit him. But you've heard of defensive driving, and that's underscored by the motor vehicle regulation that requires drivers, commercial drivers, to maintain this having their head on a swivel, as I call it, looking all around them for possible dangers. So there is evidence from which a jury could find comparative fault. However much isn't the question. They were entitled, the defendants were entitled to have that instruction. That issue had to go to the jury. The court acknowledged it was requested, albeit belatedly, but, you know, based on what the evidence showed at that point in time. So let me take you to the far end of the process. Yes. The judge gives jury instructions that do not include a comparative fault instruction. Is there then an objection to the instructions the judge gave? There didn't need to be an objection because the ---- Well, first answer to my question is no. Now tell me why. I don't think there was ---- Tell me why it doesn't matter. I don't think there was an objection because the request had been made and denied. And I think under the rule and the case law, you didn't have to sort of double down and make another objection. Because this leads to the question, where in the record can I find the denial? I can't give you the page number. As I read the record, what happens, seems to happen is the request is made. It's not given. There's no objection to the final instructions. And then this all comes up in the context of a new trial motion. But I'm not sure I can find in the record a part where the judge says before the new trial motion, I'm not giving a comparative fault instruction because.  You ---- It is there. I don't have the page number on the top of my ---- tip of my tongue. But it's in ---- And I'll look for it, too. It's in the brief. And the Court acknowledges that the request was made, and the judge says, Mr. Weiss, I'm going to deny your request. Okay? If I have two minutes, I'll ---- We'll reserve two minutes of your time. I'll save my ---- the rest of my powder for that time. Thank you, counsel. Good morning, Your Honors. May it please the Court. I'm Mark Standridge from Taunia Coast and Chaparro. I have the honor of representing Joseph Lucero in this matter this morning. I'm going to start where Mr. Worken left off. Your Honors, this is a case about the defendant's failure to choose a lane and stick with it. The Court has seen the video showing the mechanics of the injury that Alexander Kim cut into Joseph Lucero's lane on I-40 in Kingman, Arizona, or near Kingman, Arizona, failed to stay in his lane. That is how the collision occurred. Once Mr. Lucero filed suit and the defendants answered that complaint, they initially raised comparative fault as an affirmative defense. But by the time we got to trial, by the time we were working on jury instructions in April of 2024 and trying the case in May of 2024, they had unequivocally abandoned that defense. And I think that was the discussion that Judge Hurwitz, you just had with Mr. Worken. Well, here's my problem, and I need you to help me with this. Perhaps they had, but they then came back to the judge at some subsequent point, whatever their previous position had been, and said, we'd like a comparative fault instruction. She turned them down? She turned them down. And I think the part of the record the Court — But she didn't turn them down because it was too late or because they've waived it. She turned them down, I think, saying the record does — the facts don't warrant a comparative fault instruction. Am I correct? I think the judge was not — didn't give one specific reason for turning them down. If you look at the record, it's Volume 9, pages 1106 to 07. My recall of that, and I can look at it while we're talking about it, is that the judge acknowledged that defense trial counsel had sent its informal e-mail request on May 15th saying, I think we need a comparative fault instruction. That was the first time that the defendants had specifically requested such an instruction in this matter. And the judge simply said, I saw the request and I'm denying it. Okay. And what page is that in the record? Certainly, Your Honor. I'm looking at Volume 9 of the record, pages 1106 to 07. On 1106, the Court says, I know, Mr. Weiss, in your e-mail notes, so not on the record in the proceedings, in his e-mail, his informal e-mail of May 15th, you again requested a comparative fault instruction, which I'm denying. At that point, it was incumbent upon Mr. Weiss to then get up and make an objection saying — I just want to make sure I have the facts straight before you make your argument about it. When she turns it down, she doesn't give a reason. Correct. Then it's brought up again in the new trial motion, correct? Correct. And at that point, she doesn't say, I'm turning it down because it was submitted too late or because you didn't comply with my standing orders. She then says, because the facts don't warrant it. I believe that's correct. In the order denying the motion for new trial, that is the specific reason given. That is one of several viable reasons. And did you argue a waiver issue at that time? I mean, I'm looking at the record, and you don't raise an objection when, at 1106, there's no objection on waiver grounds at this time, but you raise waiver in the motion for new trial. Correct, Your Honor. We raised it as an argument in the motion for — in the response to the motion for new trial. We then re-urged that argument in our second brief on cross-appeal here. Under Rule 51, at that point in the trial, at page 1106 and 107, it was Mr. Weiss's burden to come up with the objection to say, well, Your Honor, I think you're wrong for not giving us this comparative fault instruction, and here's why. He didn't do that. And, in fact, antecedent to that, he had not ever proposed a written instruction based on the RAGI instructions for comparative fault. As I think, Judge Hurwitz, you were touching on earlier, I drafted the jury instructions in April of 2024. I emailed them to Mr. Weiss with our proposal. Again, at that point, we know what the video shows. We know what the evidence is. It's plaintiff's position that a comparative fault instruction was not in any way needed. So the way we drafted the instructions pursuant to the Court's standing order was we used this Court's stock instructions for the basic things like what is evidence. The defendants expressly agreed that no comparative fault jury instruction was necessary. They did. They — when I recirculated the e-mail or recirculated the jury instructions on April 24th, I asked, do you have anything you want to add, because I left the section in there for the defendants to propose their own contested instructions. And they said, Mr. Weiss said, no, we don't have any. That's in the record. That's in the supplemental record. That's that e-mail exchange of April 23rd and 24th between myself and Mr. Weiss. Those were then the instructions that we filed as joint stipulated instructions. There were a couple that were not stipulated, but they're not at issue here.   So I'm going to take you in a different direction. I think we understand your — your argument here. But this is more of a procedural question, but I'm curious. You filed a cross-appeal — I think you called it a protective cross-appeal — on — on the summary judgment for STI on direct negligence. So if we affirm on STI's appeal, do you concede that your direct negligence theory is duplicative of the respondent — respondent superior — superior theory? No. I respectfully no, Your Honor, because Arizona hasn't adopted what's called the McCaffey rule, which is a rule from a case coming out of Missouri. Under that rule, where a defendant essentially concedes vicarious liability, then direct claims for negligent entrustment or negligent hiring, retention, and supervision of a driver, those by law go away. Arizona had the opportunity to do that in 2024 in the Roeff case, or Roe-aff case, that is cited in our briefing, and they elected at that time not to do it. Hasn't the Arizona Supreme Court directly held — now, put aside the punitive damages issue for a moment. We're only talking now about compensatory damages. Hasn't the Court said that if there is liability under respondeat superior, it doesn't need to address direct negligence theories because they add nothing to the case? I — I don't — that's not my recall of the Arizona Supreme Court case. I think we might be talking about the same case, but they have not — they have not affirmatively adopted that rule. Well, whether they've affirmatively adopted a rule from another State or not, haven't they actually said that if there is liability under respondeat superior theory — put aside punitive damages for a moment. So let's assume that I don't buy your argument that the Court erred by — by granting summary judgment on punitive damages. In the absence of punitive damages, what do your direct negligence theories add to the case? Everybody admits that they're liable under respondeat superior. They're fighting about how liable they are, but everybody admits that. So why do we even need to get to your direct negligence theories? Because it expands the realm of evidence that the jury could consider. No, but nobody's arguing about what evidence the jury could hear. You're on appeal, and you got a judgment in your favor. The other side says, yeah, we're liable. We're just fighting about whether we should get a new trial or in what amount. So I'm still trying to figure out what possible difference do your direct negligence theories have to our — to our job today, not to the job of the district judge in admitting evidence? No, certainly. And respectfully, Judge, I think what the case law does say is that that is the difference, is that it expands the types of evidence and arguments that a plaintiff can make, both in terms of liability and in terms of — of the damages flowing from that liability. We were not allowed to present any of the evidence regarding STI's various failings in this case because of that — that summary judgment ruling. That evidence is — is highly relevant. It's part and parcel of what our claims would have been. It was highly relevant to establishing what? Highly relevant to establishing the myriad failures of both the defendants individually and collectively that damaged Andy Lucero in — in multiple ways that it did. But, counsel, I'm still unclear. If — let's just assume for the sake of this question that we were to affirm the judgment on the main appeal. Do you still want us to consider the cross-appeal? And if so, what would be different after that? I do, Judge Graber, and what we would propose, what we would ask that the Court to do is, at a minimum, affirm the existing compensatory damages verdict, but enter a limited remand only on the question of STI's direct liability and then also the punitive damages claims as well. Well, the — okay. So it's — the difference is punitive damages. It's — it's — they're somewhat part and parcel. The evidence kind of overlaps in a great way between the direct claims against STI and the punitive damages claims. What we — what I envision is basically like a bifurcated trial, where we had the compensatory kind of simple liability phase, was the driver negligent up front. I guess I'm not — I'm really not following your argument, because in your own brief on cross-appeal at 18, you — you concede that under Roe v. this would only be a protective cross-appeal. So I — it — it sounds to me like you're making a completely different argument now — This is why I'm confused as well. — standing before us than you did in your own brief, where you admitted that there's really nothing left if you prevail on STI's appeal. What the Court's talking about is the footnote that I — I put in at page — was it 18? Page 18, note 2.  Yeah. So — so, you know, we — we certainly — we know we're bound by whatever the Arizona Supreme Court says as to Arizona substantive law. Even in the face of that, our argument at trial, our argument pretrial and summary judgment was based on the Arizona Court of Appeals Purdy case, which has not been explicitly overruled or — Well, but Roe v. couldn't be clearer. It says, if there is respondeat superior liability, and now I'm quoting, and the plaintiff claims no separate or additional damages from the employer's conduct, which you don't because the damage occurs from the accident, the employer's separate liability adds nothing to the damages sought, and any related evidence is similarly irrelevant. That comes from the Supreme Court only two years ago.  Now, I understand your punitive damages argument, but I ask you to put that aside. On compensatory damages, I think your footnote is absolutely correct. Your — your separate negligence theories against STI add nothing to the case if — if the verdict is sustained with respect to respondeat superior liability. Don't you agree? Certainly. And I think at a minimum, if that is the way that the Court reads — reads the Rolfe case, I was citing it in the more limited fashion of whether or not it overruled the Lewis case or whether it — it upheld it and — and continued it to — as a proponent of it. But at a minimum, what we've raised is a protective appeal on the very off chance that this Court were to find any issue that would require reversal as to the compensatory damages judgment, which, of course, we don't concede in any way. Well, let's go back to that, because whether it's an off chance or a substantial chance or a certainty is something the three of us will decide later. You made an explicit — expressed decision in this case, I think, not to present expert testimony about the cause of Mr. Lucero's blurry vision. You've presented a lot about experts. And — and then you argued to the trial judge that was because the cause of the loss of vision was so obvious that you didn't need one. So, for a moment, I don't agree that it's so obvious. For example, Dr. Schwartz testifies that it's not the cause. So if a medical doctor can conclude that it's conclusively not the cause, I'm not sure how a layperson can conclude that it's obvious. So given the two — those two choices, obvious, in which case you don't need an expert, or not obvious, in which case you do, didn't you choose the wrong side of this equation? No, not at all, Your Honor, given, again, what's depicted on the video, what the plaintiff himself was able to testify about, what was in his medical records that were admitted without objection at trial, and then were discussed by one of our other medical experts, Dr. Rundle-Gonzalez. She is a medical doctor. She was tendered as an expert and accepted by the court. So — But she didn't testify as the causation. She didn't — she testified as to the neurological issue. Right, right. But not causation of the loss of vision. Not — not specifically, although, bizarrely, it was brought up with her in our case in chief on Cross by Mr. Wiese. And so not only at that point were the medical records, Dr. Klebel's — No, the records are there. I mean, but maybe we're jousting with each other here, and I don't have much patience for it. You never presented an expert whose testimony was that the blurry vision was caused by the accident, correct? We did not specifically call an expert to say that specifically. There is no testimony in the record to — that — from an expert who said, it is my opinion that the blurry vision was caused by the accident. The best you have are Dr. Klebel's differential diagnosis, which says there are three possible causes, and this is one of them, right? Well, we've got that, and under Fitzgerald, that's enough. But we do also have, at some point in the record, Dr. Rundle-Gonzalez suggesting or stating that blurry vision can be a symptom of TBI. So we've got both the possibility, the medical possibility that the blurry vision is caused by the injury to the eye itself — But her testimony was that it can be. Correct. And she did testify the TBI was caused by the accident. Correct. So what we've got, in addition to Dr. Klebel, is somebody else saying it's possible. Absolutely. Why is that enough? Because that's all that Fitzgerald requires. Well, although, interestingly enough, you never cited Fitzgerald to the district court or in your briefs on appeal. I know, I was a little disappointed in myself for not having caught that case. I think our focus below was the obviousness of the mechanism of injury. That being said, since the court has directed it to us and has astutely found that case, what it sets forth, what Fitzgerald sets forth, is a contested evidence rule. And it sets a fairly low bar. Judge Hurwitz, you discussed the three possibilities that a plaintiff may try to prove causation through either obviousness, direct expert testimony, or this subset where there is some non-zero amount of medical evidence that suggests the possibility of the causal connection coupled with the other evidence and circumstances in the case. And we have both of those here. We've got Dr. Clavel's differential diagnosis in the medical records that were admitted that were then discussed in a plaintiff's case in chief by defense counsel with Dr. Rundle-Gonzalez. On top of that, the other evidence and circumstances that we have, we've got Mr. Lucero's own testimony about having been able to drive a truck for almost 3 million miles perfectly before the collision, then immediately after the collision, having blurry vision, having the injury to his eye, having to have his eye washed out, and then being treated at the Kingman ED. We have Sergeant Otto, one of the first responders, who sees the injuries to the plaintiff at the scene, documents them, and then interviews plaintiff at the Kingman ED and confirms the reports of the blurry vision that day. We also have compelling testimony from Mr. Lucero's wife, Sandra, who had Mr. Lucero send her a picture of himself that night after the collision, which showed the injury that was Exhibit 4 below. And then we also had her talking about a time she was sitting next to him. She was sitting to his left on the couch and basically tries to do a finger test where she passes her finger in front of his left eye and doesn't get any response until the finger is almost midpoint through his face. That two-part set of evidence meets the Coca-Cola versus Fitzgerald test. And with that, and that assumes the very generous spot I think we've all given defendants today, that we're assuming that the entire one-line verdict in this case was attributable to the eye injury. This court has told us for 50 years, at least, starting with the Porterfield case, cited in our brief, that we can't do that. This court is not going to pierce a one-line verdict to attribute damages to any particular calculation that was offered to the jury. Whatever math and reasoning that the jury put into coming up with the number that they did, they left that in the jury room. And again, I know that one... That can't be the law. So let's assume the jury was allowed to consider as a matter of damage the fact that the Arizona Cardinals have never made the playoffs. But the verdict was not apportioned. Surely, we would reverse in that case because they were allowed to consider an improper item when awarding damages. That's their argument in this case, that you didn't establish sufficient foundation for the law's provision. And if they're right, then I don't see why the general verdict solves the problem. Well, A, they're not right. And B, this court has told us for 50 years that we can't pierce that one-line verdict. And I would note that it was a one-line verdict form that was requested by the defendants and granted by the court. The eye injury wasn't even the primary focus of our case-in-chief at trial. We had two different experts talking about various aspects of the neurological injuries and the neurobiological compromise. We had Dr. Miranda to talk about the neck and spinal injuries. We had the plaintiff and his family to talk about the emotional distress and loss and enjoyment of life. And of course, we had Dr. Volkov to quantify the lost wages and to quantify the economic damages. The jury was free to select from any one of those calculations of damages and any combination of them in reaching their verdict. I can't come in here and say they awarded half a million for the eye injury, half a million for the TBI. I can't do that any more than the defendants can come in and say the entire 2 million and change verdict came solely from the eye injury. I see I have about 15 seconds left. So to sum up, at a minimum, the jury's verdict in this matter should be affirmed. And we would request reversal for limited retrial as to the direct negligence claims and punitive damages claims. Thank you, Your Honors. I'm going to come back to the issue of the jury instructions and mention with regard to one of the last comments made. There was a request, there was a proposed comparative fault instruction. So general verdict form aside, which I don't think solves the problem when you don't have substantial evidence to support that verdict. So there was clearly a request, albeit late, for a jury instruction on comparative fault. There was a proposed form, a verdict for comparative fault. And what's overlooked here is that, sure, the comparative fault defense was asserted in the answer. And then perhaps the defense drifted away from it. But then Mr. Lucero testifies, and he testifies to his inattention. And that reinvigorates the issue. And, you know, the court didn't deny the instruction because it was untimely. The court, in its order denying the motion for new trial, mentioned only one reason. That, in her view, there wasn't evidence to support it. Well, if there's absolutely no evidence, that would be a correct conclusion. But here there was some evidence. And how much there was and what effect it might have is for the jury to decide, not for the trial judge. And, again, that's the inattention and the failure to take evasive action. And that would have supported the jury instruction. And it looks like I'm out of time. And thank you for the conversation. And if there are other questions, of course, I have time for that. I don't think so, counsel. Okay. Thank you very much. Thank you to both of you for your helpful argument. That case is now submitted.
judges: GRABER, HURWITZ, DESAI